IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROCKVALE OUTLET CENTER, LP, | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | NO. 09-00290 |
| v. | : | |
| WACHOVIA COMMERCIAL MORTGAGE SECURITIES, INC., et al., | : | |
| Defendants | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                 **July       , 2009**

      The Plaintiff, Rockvale Outlet Center, LP ("Rockvale") has filed an Amended Complaint alleging breach of contract charges against the Defendant, Wachovia Commercial Mortgage Securities, Inc. ("WCMSI"), claiming damages in excess of $4,400,000 plus interest and consequential damages. The Defendants have filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Due to the ambiguity in the record as to whether WCMSI was in possession of the Mortgage Loan at the time of the alleged breach, and accepting the facts in favor of the non-moving party[1], I will deny WCMSI's motion in order to allow for further discovery.

---

[1] For purposes of deciding a motion to dismiss, "the court must accept the well-pleaded facts as true and resolve them in the light most favorable to the plaintiff. " Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp., 185 F.3d 154, 165 (citing Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998); Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)).

**I. BACKGROUND**[2]

In February 2007, the Plaintiff, Rockvale, applied to Wachovia Bank ("Wachovia") for a loan in the amount of $94,000,000. Am. Compl. ¶ 13. Rockvale entered into a loan (the "Loan") with Wachovia for $92,400,000 on April 20, 2007, as evidenced by the promissory note. Id. ¶ 15. The Loan was secured by an Open-End Fee and Leasehold Mortgage (the "Mortgage"), among other things, by a filing also dated April 20, 2007. Id. ¶ 16. The Loan was also secured by three reserves (the "Reserves") held back from the original distribution: the "First Occupancy Holdback Reserve" (the "First Reserve")[3], the "Second Occupancy Holdback Reserve" (the "Second Reserve")[4],

---

[2] All facts are taken from the Plaintiff's Complaint, and for the purposes of this motion, are accepted as true with all reasonable inferences drawn in favor of the Plaintiff.

[3] Section 3.7 of the Mortgage specifically pertains to the First Reserve:
Section 3.7     First Occupancy Holdback Reserve
  (a) Contemporaneously with the execution hereof, Borrower has established with Lender a reserve in the amount of $2,200,00.00 (the "First Occupancy Holdback Reserve")…
  (b) Provided that no Event of Default has occurred and is continuing under the Loan Documents upon satisfaction of the First Occupancy Holdback Reserve Release Conditions…Lender shall disburse the funds held in the First Occupancy Holdback Reserve to Borrower.
  (c) The term "First Occupancy Holdback Release Conditions" shall mean that both (i) the occupancy rate of the Property is then equal to or greater than 91%, and (ii) the annualized collected revenue is at least $12,300,000.00.

[4] Section 3.8 of the Mortgage specifically pertains to the Second Reserve:
Section 3.8     Second Occupancy Holdback Reserve
  (a) Contemporaneously with the execution hereof, Borrower has established with Lender a reserve in the amount of $2,200,000.00 (the "Second Occupancy Holdback Reserve")…
  (b) Provided that no Event of Default has occurred and is continuing under the Loan Documents upon satisfaction of the Second Occupancy Holdback Reserve Release Conditions, Lender shall disburse the funds held in the Second Occupancy Holdback Reserve to the Borrower.
   The term "Second Occupancy Holdback Release Conditions" shall mean that both (i) the occupancy rate of the Property is then equal to or greater than 92% and (ii) the annualized

and the "Tenant Leasing Holdback Reserve" (the "Lease Reserve")[5]. Id. ¶ 26. According to Rockvale, the Reserves held back by Wachovia were to be deposited in the account of the entity servicing the Loan and to bear interest, for Rockvale's benefit, at a rate equal to "the then prevailing commercial money market rate." Id. ¶ 27.

Circa June 1, 2007, Rockvale alleges that Wachovia sold the Loan to WCMSI pursuant to a Mortgage Loan Purchase Agreement (the "Purchase Agreement") providing for the deposit of the Loan into a "Trust Fund." Id. ¶ 23. The Trust was created under a Pooling and Servicing Agreement (the "Pooling Agreement"), listing WCMSI as depositor. Rockvale also alleges that the co-defendant, Bank of America ("BOA"), is the current Trustee for the Trust. Id. ¶¶ 24-25.

Rockvale further contends that since the closing of the loan on April 20, 2007, it has complied with all provisions of the Mortgage, including providing Wachovia with the pertinent financial information concerning the revenue generated by the outlet and

---

collected revenue is at least $12,470,000.00.
[5] Section 3.11 of the Mortgage specifically pertains to the Lease
Section 3.11   First Occupancy Holdback Reserve
  (a) Contemporaneously with the execution hereof, Borrower has established with Lender a reserve in the amount of $250,000 (the "Tenant Leasing Holdback Reserve")…
  (b) Provided that no Event of Default has occurred and is continuing under the Loan Documents upon satisfaction of the Tenant Leasing Holdback Reserve Release Conditions, Lender shall disburse the funds held in the Tenant Leasing Holdback Reserve to Borrower.
  (c) The term "Tenant Leasing Holdback Reserve Release Conditions" shall mean that Borrower has provided evidence satisfactory to Lender that the Tenants at the Property known as "Olive Garden" and "Susquehanna Bank" have commenced full paying rent pursuant to their respective leases at the Property. Such evidence shall include, but not be limited to, a tenant estoppel certificate from each Tenant in form and substance satisfactory to Lender.

certified rent rolls. Furthermore, Rockvale has never entered an "Event of Default," which would justify the non-disbursement of the Reserves. Id. ¶ 31.

Accordingly, in September 2007, Rockvale requested from Wachovia the release of the First Reserve; however, Wachovia notified Rockvale that the request would be sent to CWCapital, as the Special Servicer, for review. Id. ¶ 32. In November 2007, Rockvale again requested the release of the First Reserve, including with its request certified documents – the "Schedule of Gross Income" and Rent Roll – supporting its eligibility. Id. ¶ 33. CWCapital responded this time, advising Rockvale that its request would be first analyzed by CWCapital and then by American Capital Ltd. ("ACS"), as the "Directing Certificate Holder." Id. ¶ 34. In December 2007, Wachovia Securities informed CWCapital that the underwriting of the loan had accounted for the space occupied by PA Outlet Management in its calculations of Rockvale's occupancy rate and annualized collected revenue. Id. ¶ 35. Also in December 2007, Wachovia Securities found that Rockvale had a total gross income of $12,443,484, which would qualify it for the release of the First Reserve. Id. ¶ 36.

In January 2008, CWCapital asked Rockvale to again resubmit its request for the release of the First Reserve and confirmed that it only screened the reserve release request for Wachovia, while ACS was the final decision-maker. Id. ¶ 37. Consequently, Rockvale, on January 7th, resubmitted the request and again provided detailed financial

4

information.  Id. ¶ 38.  CwCapital subsequently requested additional information, so Rockvale provided it with sufficient financial information, which CWCapital agreed to preserve, to support a request for the release of all three Reserves.  Id. ¶ 39.

On July 1, 2008, Rockvale tendered a "Reserve Disbursement Request Schedule," to Wachovia, requesting specifically the release of all three Reserves; attached to this request was a current gross income schedule, again confirming that Rockvale was eligible for disbursement.  Id. ¶¶ 40-41.  Also in July 2008, Rockvale wrote CWCapital, providing evidence that both Olive Garden and Susquehanna Bank, as required in Section 3.11 of the Mortgage, were maintaining their leaseholds and fully paying rent.  Additionally, on July 30th, Rockvale wrote CWCapital again, attempting to further verify what was necessary to comply with the terms of Sections 3.7, 3.8, and 3.11 of the Mortgage.  Id. ¶ 43.  In its response, CWCapital asserted that it was in the process of assembling the information already provided by Rockvale and again requested additional data, which Rockvale immediately tendered on August 28, 2008.  Id. ¶ 44.  Further, on September 4, 2008, CWCapital submitted yet another request for information, this time for the profit figures for PA Outlet Management; when Rockvale complied immediately, CWCapital informed it that the Reserves request was being reviewed.  Id. ¶ 45.

On July 9, 2008, one tenant, Steve & Barry's Pennsylvania, LLC ("S&B") filed for Chapter 11 Bankruptcy; this filing resulted in the sale of the S&B assets to a new tenant

5

leasehold, liable for all obligations under the S&B lease. Id. ¶¶ 46, 47. However, ACS declined to include both the rent paid in place of S&B and that paid by PA Outlet Management in its calculation of Rockvale's eligibility for the release of the Reserves. Id. ¶ 48. Rockvale then submitted Orders from the Bankruptcy Court evidencing that the new tenant in the S&B leasehold had purchased S&B's assets and information confirming that PA Outlet Management revenue had been included in the annual collected revenue calculation since the Loan's establishment. Id. ¶ 49. Regardless of this supplied documentation, ACS requested further income and expense statements from PA Outlet Management, which Rockvale supplied and subsequently summarized and submitted with a demand for the release of the Reserves on October 3, 2008. Id. ¶¶ 50, 51. On October 31, 2008, CWCapital finally consented to release only the Lease Reserve to Rockvale, refusing to release the First and Second Reserves. Id. ¶¶ 52, 53.

Rockvale now contends that the Defendants intentionally caused the delay of the disbursement of the Lease Reserve and refused to disburse the First and Second Reserves, despite Rockvale's compliance with the terms of the Loan Documents. Id. ¶ 57. It is further alleged that these actions resulted in a breach of contract to Rockvale's detriment, and Rockvale now claims damages in excess of $4,400,000. Id. ¶ 64. In response, the Defendant, WCMSI, has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that at the time of the alleged breach, WCMSI had deposited the Mortgage Loan into a Trust and was no longer its holder or

owner.  Defs.' Mot. To Dismiss Am. Compl. at 2.

## II. PROCEDURAL HISTORY[6]

This case originated in the Court of Common Pleas of Lancaster County, Pennsylvania on December 11, 2008.  Rockvale initially filed suit against Wachovia, Wachovia Securities, ACS, and CWCapital, and the case was removed to the Eastern District of Pennsylvania on January 21, 2009.  All four original Defendants filed a Joint Motion for Summary Judgment.  In support of their Motion for Summary Judgment, the original Defendants provided documentation reflecting the sale and assignment of the Loan to WCMSI and the placement of the Loan into a Trust.  Rockvale then amended its Complaint, alleging breach of contract against new Defendants: WCMSI and BOA, as the successor to Wells Fargo Bank, as Trustee for the registered holders of Wachovia Bank Commercial Mortgage Trust.

On June 8, 2009, BOA filed an Answer with Affirmative Defenses.  On the same day, WCMSI filed the present Motion to Dismiss.

## III. STANDARD FOR MOTIONS TO DISMISS:

---

[6] The facts herein were taken from the Plaintiff's Amended Complaint at pages 6-7.

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a pleading for "failure to state a claim upon which relief can be granted." The rule is designed to screen out cases where "a Complaint states a claim based upon a wrong for which there is clearly no remedy, or a claim which the Plaintiff is without right or power to assert and for which no relief could possibly be granted." Port Auth. v. Arcadian Corp., 189 F.3d 305, 311-312 (3d Cir. 1999). Under Rule 12(b)(6), a pleading should not be dismissed for failure to state a claim unless it appears beyond doubt that the non-moving party can prove no set of facts in support of its claim which would entitle it to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The issue, therefore, is not whether the non-moving party will ultimately prevail, but whether it is entitled to offer evidence to support its claims. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Maio v. Aetna, Inc., F.3d 472, 482 (3d Cir. 2000).

In considering whether a pleading should be dismissed for failure to state a claim upon which relief can be granted, a court must consider only those facts alleged in the pleading and accept all of the allegations as true, drawing all reasonable inferences in favor of the non-moving party. ALA v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994); see also Lum v. Bank of America, 361 F.3d 217, 222 (3d Cir. 2004) (in deciding motions pursuant to Rule (12)(b)(6), courts generally consider only allegations in the pleading, exhibits attached to the pleading, matters of public record, and documents that form the basis of a claim).

## IV. DISCUSSION

First, accepting the facts as alleged by the Plaintiff, it does appear that Rockvale has asserted a claim for which it may reasonably be entitled to relief. According to the facts asserted in the Amended Complaint, Rockvale complied precisely with the terms of the terms of the Mortgage pertaining specifically to the Reserves and qualified for their timely disbursement.

The dispositive issue thus is whether WCMSI was a party to the Mortgage Loan at the pertinent times and may be held responsible for the non-disbursement of the Reserves. WCMSI contends that the act of depositing the Mortgage Loan into the Trust relieves it of all ownership and responsibility for the Mortgage Loan and the Reserves during the time of the alleged breaches. Defs.' Mot. To Dismiss Am. Compl. at 2. WCMSI further alleges that the Mortgage Loan Purchase Agreement (the "Purchase Agreement") and the Pooling and Servicing Agreement, (the "Pooling Agreement") attached as Exhibits "F" and "G" to the Plaintiff's Amended Complaint, evince the fact that WCMSI immediately assigned the Mortgage Loan to the Trust. Id. Rockvale maintains, in its opposition to the motion, that it is entitled to more time for discovery, since the documents do not conclusively prove WCMSI retained no interest in the Loan and Mortgage, nor do they

show WCMSI is discharged of all responsibility for the Reserves since the Mortgage was deposited into the Trust.

According to the Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has declared that in order to survive a motion to dismiss, a complaint need not exhibit a probability of success on the merits, but must put forth "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the alleged act. Bell Atlantic Corporation v. Twombly 550 U.S. 544, 557 (2007).

Here, Rockvale has asserted a cognizable claim for breach of contract against WCMSI. The Purchase and Pooling Agreements do suggest that WCMSI bought the Loan from Wachovia then immediately deposited it into the Trust on June 1, 2007. However, Exhibit "A" to the Amended Complaint is a document recording the assignment of the Mortgage Loan from Wachovia to Wells Fargo Bank ("Wells Fargo") on August 9, 2007. The Exhibits indicate that Wachovia first sold the Mortgage to WCMSI then later assigned it to Wells Fargo. It is untenable that both Wachovia and WCMSI, separate entities, were in control of the same Mortgage Loan during the same period. Hence, there is sufficient ambiguity in the record to justify a denial of WCMSI's Motion to Dismiss in order to allow for further discovery. It is reasonable to envisage a scenario in which further discovery would reveal WCMSI did bear responsibility for the

loan during the pertinent period.

**V. CONCLUSION**

In conclusion, because there is ambiguity in the record as to whether or not WCMSI was a party to the Mortgage Loan during the period of alleged breach of contract, I will deny the Defendant's Motion to Dismiss. Further discovery will expectantly cure the inconsistency currently reflected by the documents in the Amended Complaint.